**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JUSTIN ANTONIO ANDERSON, | Case No.: 18cv1751-JAH (MSB) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| RALPH DIAZ, Secretary, et al., | |
| Respondents. | |

Justin Antonio Anderson (hereinafter "Petitioner") is a state prisoner proceeding pro se with a First Amended Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (ECF No. 3.) Petitioner was convicted in the San Diego County Superior Court of conspiracy to commit first degree murder and assault with a deadly weapon, with a gang enhancement, and sentenced to twenty-five years to life in prison. (<u>Id.</u> at 1-2.) He claims his federal constitutional rights were violated because the evidence is insufficient to prove he entered into an agreement to murder or assault anyone (claim one), and because the corpus delicti of conspiracy was not established, as he was convicted based solely on his own statements of a crime which never occurred (claim two). (<u>Id.</u> at 7-13.) He also alleges in claim one he received ineffective assistance of counsel due to his trial counsel's failure to move for an acquittal based on insufficient evidence and failure to interview and call as defense witnesses eight fellow gang members and co-conspirators. (<u>Id.</u> at 9-56.)

Respondent has filed an Answer and lodged portions of the state court record. (ECF Nos. 8-9.) Respondent argues that habeas relief is not available because the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and claim two is not cognizable on federal habeas because it rests solely on state law. (ECF No. 8-1 at 12-20.) Respondent contends the ineffective assistance of counsel claims should not be considered because Petitioner has failed to exhaust state court remedies, as the claims have not been presented to the state supreme court, only to the state superior court. (EFC No. 8 at 2-3.)

Petitioner has filed a Traverse. (ECF No. 11.) He argues that because the evidence he entered into an agreement to kill or assault anyone is absent or so weakly circumstantial as to amount to pure speculation, the state court adjudication of claims one and two involves an unreasonable application of clearly established federal law, which requires proof beyond a reasonable doubt of that element of his conspiracy conviction. (Id. at 1-10.) He requests that if the Court finds his ineffective assistance of counsel claims are not exhausted, this action be stayed and his federal petition be held in abeyance while he returns to state court to exhaust state court remedies. (Id. at 10 n.3.)

The Court recommends denying habeas relief on claims one and two because the state court adjudication is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court recommends denying the ineffective assistance of counsel claims irrespective of any failure to exhaust state court remedies and without a stay and abeyance on the basis they are plainly meritless.

## I.      PROCEDURAL BACKGROUND

In a five-count Third Amended Information filed in the San Diego County Superior Court on August 5, 2015, Petitioner was charged with conspiracy to commit first degree murder and assault with a deadly weapon in violation of California Penal Code § 182(a)(1) (count one), two counts of criminal street gang conspiracy in violation of California Penal Code § 182.5 (counts two and four), and two counts of attempted murder in violation of

California Penal Code §§ 187(a) and 664 (counts three and five).  (Lodgment No. 1, Clerk's Transcript ["CT"] at 478-88.)  Nine overt acts were alleged as to count one, consisting of telephone conversations recorded from a wiretap of Petitioner's cell phone, and it was alleged he committed the offense for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist the gang within the meaning of California Penal Code § 186.22(b)(1).  (Id.)

On September 8, 2015, a jury returned a guilty verdict on count one, found the gang allegation true, and returned not guilty verdicts on the remaining counts.  (CT 843-50.)  On October 16, 2015, he was sentenced to twenty-five years to life in prison.  (CT 851.)

Petitioner appealed, raising claims one and two presented here, but without the ineffective assistance of counsel aspects of claim one.  (Lodgment No. 3.)  The appellate court affirmed.  (Lodgment No. 5, People v. Anderson, No. D069071, slip op. (Cal.App.Ct. Feb. 27, 2017).)  On March 27, 2017, he filed a petition for review in the state supreme court raising the same claims, which was summarily denied.  (Lodgment Nos. 6-7.)

Petitioner constructively filed a habeas petition in the state superior court on January 16, 2018, presenting the ineffective assistance of trial counsel claims raised in claim one here, as well as claims alleging his trial counsel failed to object to the conspiracy jury instructions as misleading and confusing, to file a motion for a new trial, to seek recusal of the trial judge, and to object to the introduction of the telephone calls which were not alleged as overt acts.  (ECF No. 9-25.)  That petition was denied on March 26, 2018, on the basis that: "Petitioner failed to provide all reasonably available evidence to support his allegations of IAC," he "was improperly utilizing a Petition for Writ of Habeas Corpus as a 'second appeal' challenging the sufficiency of the evidence at trial," and "was improperly utilizing a Petition for Writ of Habeas Corpus as a 'substitute appeal' for issues he could have raised on appeal."  (ECF No. 9-26 at 2.)  Petitioner filed a motion for reconsideration with additional documentation which was denied on May 7, 2018, on the basis that he did not show a change in the law or facts, and an appeal of the denial of a habeas petition lies only in the appellate court.  (Id. at 3.)

## II.  **TRIAL PROCEEDINGS**

San Diego Police Detective Eric Morales testified that he works with the violent crimes task force, which includes Police, Probation, Sheriff and FBI officers, along with investigators from the office of the San Diego District Attorney, who attempt to identify, disrupt and dismantle criminal enterprises associated with street gangs. (Lodgment No. 2, Reporter's Tr. ["RT"] at 227-29.)  Petitioner, a documented member of the Lincoln Park gang, was a subject of surveillance in 2013, which included a wiretap of his cell phone. (RT 229-32.)  On the evening of April 27, 2013, Detective Morales intercepted a phone call from Petitioner to fellow Lincoln Park member Glenn Gray in which Petitioner said he was so upset he "could almost cry" because he had spotted a group of Crips gang members hanging out "deep" in Lincoln Park territory.  (RT 233-39.)  Based on additional calls monitored over the next couple of hours, including calls by Petitioner trying to obtain guns from other Lincoln Park gang members, Detective Morales was concerned something was about to happen.  (RT 240.)  He notified his supervisor, Sergeant Cruz, who said he would notify other officers and saturate the area with a police presence.  (RT 240-41.)

Vadasto Cruz, a San Diego Police Sergeant with experience in the street gang unit, testified that he is a supervisor of the FBI-led violent crimes gang task force whose mission is to assist local law enforcement in addressing gang issues.  (RT 245-46.)  He said there are two main African-American gangs in San Diego, the Crips who are associated with the color blue and call each other "cuz," and the Bloods who are associated with the color red and call each other "blood."  (RT 378.)  Lincoln Park is associated with the Bloods.  (RT 428.)  On the evening of April 27, 2013, Sergeant Cruz was notified by Detective Morales that calls were intercepted indicating Petitioner had observed a large group of Crips in Lincoln Park territory and it appeared he and other gang members were gathering firearms in order to commit a criminal act.  (RT 251.)  Sergeant Cruz activated the task force's reactive mechanism, requested a saturation of police presence in the southeastern area of San Diego where Lincoln Park gang members congregate, and responded in an unmarked police car to the 5200 block of Logan Avenue, where most of Petitioner's intercepted calls

were made. (RT 252-57, 260.) Calls intercepted later that night and early the next morning indicated Petitioner had become aware of the law enforcement presence, at which point, about 2:00 or 3:00 a.m., Sergeant Cruz became confident no violent acts were going to take place and ordered the officers to stand down. (RT 260-61.)

Sergeant Cruz testified that gang members have recently become aware their phones may be tapped and have resorted to coded terminology for guns and drugs. (RT 259.) Calls intercepted from Petitioner's phone were summarized by Sergeant Cruz and played for the jury while he explained the terminology used. In an 8:25 p.m. call from Petitioner to Sherbly Gordon, Petitioner asked if he should come to a nightclub and whether the nightclub was conducting pat-downs prior to entering, to which Gordon responded he should not come because there were too many "Babbies" or "Babylon" there, terms used to describe police officers. (RT 266-67.) In a 9:22 p.m. call, Petitioner, whose gang moniker is "J Hawg," said he had just gone somewhere with his younger brother, Desmond Crisp, a Lincoln Park gang member with the moniker "Lil Hawg," and they were returning to Lincoln Park territory near the 2500 block of Logan Avenue. (RT 265-68, 271-72.)

In a 9:39 p.m. call from Petitioner to Aaron Harvey, a Lincoln Park gang member with the moniker "Lil Struck," Petitioner is heard laughing and telling Harvey he wants to do something that night like go to a bar rather than "sit up at Grammie's all night." (CT 528-30.) In a 9:52 p.m. call by Petitioner to Glenn Gray, a Lincoln Park gang member, he told Gray he has just seen "rippers" (changed from "crippers" because Lincoln Park gang members avoid using "c" when possible as it is associated with the Crips), meaning members of the Crips gang, in Lincoln Park territory where Gray has seen them before, that the Crips were "deep," meaning a significantly large number of them, and that it made him want to cry the same way Gray had wanted to cry on that previous occasion. (RT 269-70, 379, 383-85; CT 537-38.) In a 9:58 p.m. call to Aaron Harvey, a Lincoln Park gang member, Petitioner said "you need to calm me down." (RT 268-69, 272; CT 542.) Petitioner called Gray again at 10:30 p.m. and said: "I'm trying to go do that right now," and: "Do you want some of my folks to come get you?", to which Gray declined. (RT 272-

73; CT 544.) Petitioner called Bobby Towers, a Lincoln Park gang member, at 10:36 p.m., and asked "where Beef at." (RT 273; CT 548.)

In the first charged overt act, Petitioner called Darryl Charles, a Lincoln Park gang member with the moniker "Beef" or "Tiny Beef," at 10:40 p.m., and asked if he can borrow "that." (RT 273-74.) In the second overt act, during the same call, Charles appeared to immediately understand what Petitioner referred to, said he does not have it, and told Petitioner he would have to call either "Kal" or "Brim" to obtain the item. (RT 274.) "Kal" refers to Deon Winters and "Brim" to Alonzo Harvey, both Lincoln Park gang members. (RT 275.) Petitioner went on to tell Charles that "if I get it you may not want it back," to which Charles replied: "It's going to be like that," and Petitioner said "just know it's going to be briv if you get it back." (RT 274-75.) The term "briv" refers to drama, or that something bad was going to happen. (RT 275.) Petitioner then called Deon Winters and Alonzo Harvey, but both calls went unanswered. (RT 275-76.)

The third overt act, a phone call at 10:44 p.m., Petitioner called Deon Winters and asked: "Hey, where's bro's shit at?", which at first Winters did not seem to understand, but once Petitioner explains that the "bro" he was referring to is Darryl Charles by using "BF" and "TB" as shortened versions of Charles' monikers Beef and Tiny Beef, Winters realized what Petitioner was asking for and directed him were to find it in a shed "in my pack." (RT 275-77; CT 553.) It was at that point Detective Morales called Sergeant Cruz and reported he was concerned something might be about to happen. (RT 277.) In the fourth overt act, Petitioner called Deon Winters at 10:55 p.m., asked if he knew "where Brim be putting the other one at," to which Winters responded no. (RT 354; CT 555.)

In the fifth overt act, Petitioner called Winters again at 11:03 p.m., and Sergeant Cruz said it sounded as if Petitioner told Winters he found the gun in the shed where Winters said it was, but was looking for another one, asked Winters if he knew where Aaron Harvey might have hidden a second gun, and Winters directed Petitioner where to look. (RT 355-57; CT 556-58.) That call was interrupted at 11:06 p.m. by a call (the sixth overt act) from Jawaun Jones, a Lincoln Park gang member with the moniker "Briv" or "J

Briv," during which Petitioner asked if he can borrow "that," to which Jones replied "Peanut" has it. (RT 355-58.) Sergeant Cruz testified it sounded as though Jones initially thought Petitioner was asking for money during that call, to which Petitioner replied "no, I don't want that. I don't need that," and Jones immediately said: "Peanut got that." (RT 355-56; CT 562.) In the seventh overt act, a phone call between Petitioner and Deon Winters at 11:09 p.m., Petitioner told Winters: "I'm tryna bust a move somewhere, somewhere else right now," and that he found the gun where Winters said it would be but was looking for a second gun. (RT 397-98; CT 565.) The eighth overt act is a phone call at 11:38 p.m. from Petitioner to Lincoln Park gang member Alonzo Harvey in which Petitioner asked "where you put that at?", to which, according to Sergeant Cruz, Harvey replied with instructions on where Petitioner should look in the shed for a second gun. (RT 400; CT 571.) In that call Harvey asked Petitioner "what you got goin on?", and he replied "you already know I'm up here with some-, something freaky." (CT 571.) The ninth and final overt act is a 12:46 a.m. call from Stanley King, a Lincoln Park gang member, to Deon Winters using Petitioner's phone, in which King said he is stuck at Grammie's house due to the police being "everywhere." (RT 404-05; CT 581.) Sergeant Cruz testified that voices are heard in the background while Petitioner is making his calls, and it is clear those voices are from people with Petitioner. (RT 270-71; 354-55.)

At about 11:40 or 11:50 p.m., Petitioner's green Saturn was observed parked in the 5200 block of Logan Avenue. (RT 366, 408.) At that point Petitioner began making calls discussing the use of a police scanner, asking a female to drive around the neighborhood to see if she would be stopped by police, which she was, and indicating he and the people he was with were not able to move due to the police presence, saying "we can't even fucking get the hell away from here," "we can't hop, skip and jump and not get in nothing," and "as soon as we get the first chance to bop, we outta here." (RT 366-67, 400-11; CT 584-97.) Petitioner called Deon Winters the next morning at 10:02 a.m., told him the police did not leave the area until 2:00 or 3:00 a.m., and said "we was gonna leave and go somewhere else" but did not do so because of the police. (CT 598-600.)

A phone call was intercepted at 10:05 a.m. the next morning to Petitioner's phone from Deandre Towers, a Lincoln Park gang member in state prison illegally using a cell phone, discussing gang activity unrelated to the prior evening, which the prosecutor used as background to show Petitioner was an active gang member and that Christopher Anderson, one of his two younger brothers, was in custody that night, and therefore when Petitioner referred to being with his younger brother that night he must have been referring to Desmond Crisp. (RT 410-28.) The calls were played for the jury and transcripts are in the record. (RT 369-429; CT 516-626.) The parties stipulated that Stanley King, Aaron Harvey, Glenn Gray, Bobby Towers, Deandre Towers, Darryl Charles, Alonzo Harvey, Deon Winters, Jawaun Jones, Desmond Crisp and Byresse Taylor were all active Lincoln Park gang members in 2013, and that Lincoln Park is a criminal street gang within the meaning of California law.[1] (RT 1360-61.)

Tabitha Harmon testified that Petitioner is the father of her child and a Lincoln Park gang member, and they have known each other over seven years and are currently in a relationship. (RT 445-46, 452.) On the evening of April 27, 2013, she was at a house on Logan Avenue with Petitioner, Aaron Harvey and Grammie, and was asked to drive to the store for drinks and cigarettes. (RT 447-50.) She did not recall if it was Petitioner who asked her to drive to the store or if she reported back about specific locations of police vehicles. (RT 451-53.) She was pulled over by the police for no reason but not given a ticket, and said there was a police car on every street that night. (RT 453-54.)

Chris Tiller testified that he lived across the street from a house at 5403 Grape Street in April 2013, which could be seen from Euclid Avenue, and the house hosted parties once or twice a month attended by 50 to 75 people each time, mostly African-Americans who often used gang slang such as calling each other "cuz." (RT 459-64.) A gang detective said Euclid Avenue and 54th Street are both major north-south thoroughfares in Lincoln

---

[1] Other than Bobby Towers, Deandre Towers and Alonzo Harvey, all of those men were initially charged in this matter, and Crisp, Charles, Gray and King entered guilty pleas and were sentenced to prison terms prior to Petitioner's trial. (CT 1-16, 729.)

Park territory.  (RT 1213.)  Marquis Anderson testified that he held a party on April 27, 2013, at his house on Grape Street near 54th Street, with about 100 people.  (RT 471-72.) Many of the guests were Crips, and some of the people living at the house were Crips.  (RT 473-77.)  The party was in full swing at 9:00 p.m. and over by midnight.  (RT 477.)

Don Holmes, an investigator with the office of the San Diego District Attorney, testified that he reviewed the location records of Petitioner's cell phone between 8:10 p.m. on April 27, 2013, to 1:43 a.m. on April 28, 2013.  (RT 485-86.)  Petitioner's phone used a cell tower near Logan Avenue from 8:10 to 9:05 p.m., indicating it was stationary at that time, but moved 1.5 miles to the west at 9:10 p.m. before returning to the original tower from 9:15 to 9:26 p.m.  (RT 498-503.)  The phone began moving north at 9:28 p.m., and was using a cell tower near 54th Street from 9:32 to 9:44 p.m., moving south and east.  (RT 504-07.)  It continued south from 9:52 to 9:57 p.m., and by 10:08 p.m. it was back near Logan Avenue where it remained stationary until the next day.  (RT 508-60.)  The 9:44 p.m. call is consistent with traveling on 54th Street, and the 9:52 p.m. call is consistent with traveling south on 54th Street toward Euclid Avenue.  (RT 561-62.)

Other than the testimony of gang experts, the remainder of the prosecution's case involved the four counts on which Petitioner was acquitted, which included participation in two drive-by shootings, one on July 28, 2013, and one on August 4, 2013.  On July 18, 2013, a gold 2000 Toyota Camry was stolen, and when it was recovered it had two bullet holes and the windows had been shot out.  (RT 582-84.)  Alberto Castellanos testified that he stole the Camry on July 18, 2013, and drove it five days before selling it for five hundred dollars to a teenager named Chris.  (RT 590-95.)

A city bus driver testified that on July 28, 2013, at about 3:00 or 4:00 p.m., he was stopped at the corner of Market and 32nd Streets when a car with two African-American males in a gold Camry pulled up next to the bus; the driver was wearing latex gloves and the other man was crouching down in the back seat with a green bandana over his face. (RT 663-72.)  The car made a right turn in front of the bus and proceeded down 32nd Street; the security videotape from the bus showed a green car following a gold Camry with the

first three characters of the license plate matching the stolen Camry.  (RT 673-77; 872-73.)  Several eyewitnesses testified that gunshots were fired near the corner of Market and 32nd Streets, and a brown or gold car which drove by just before the shots were fired sped away immediately afterwards with an African-American male holding the steering wheel with one hand and a handgun out the window with the other, and with an African-American male in the back seat.  (RT 621-33, 645-47, 689-762.)  Evidence collected at the scene included .40 caliber and .380 caliber shell casings on the ground, a bullet in a nearby house, and bullet holes in two parked cars and a child's play structure.  (RT 780-819.)  The green Saturn seen on the surveillance video from the bus was later found parked in front of the house where Petitioner lived with his mother, and was registered to Petitioner's mother, who identified it as belonging to her.  (RT 1023-36.)

Don Holmes testified that Petitioner's cell phone, from about 3:58 p.m. to 4:16 p.m. on July 28, 2013, was connected to a cell tower near 505 32nd Street, and began moving away from that area about 4:24 p.m.  (RT 821-39.)  John Cisneros, a San Diego Police Officer, responded to the shooting at 505 32nd Street which took place about 4:15 p.m. on July 28, 2013, in West Coast Crips territory.  (RT 860-62.)  In his experience, solo drive-by shootings are uncommon, and typically involve a hot car which is stolen and a cold car which does not raise flags with the police.  (RT 864, 879.)  Shots are fired from the hot car, which is then abandoned, with the trailing cold car used for escape.  (RT 864-65.)

The police were dispatched to 5211 Kalmia Street on a shots fired call at 5:58 p.m. on August 4, 2013.  (RT 902-05.)  Orlandous Jackett testified that on August 4, 2013, he owned a Camaro painted bright sparkly blue with gold rims and "Bitch Rollin'" painted on the side.  (RT 913-15.)  There were five bullet holes in his car, but he did not remember how they got there and did not remember telling a detective at the hospital that night that he was driving on 52nd Street when two African-American males with their faces covered drove toward him and fired at him five times.  (RT 917-19.)  Police officers who were responding to a shots fired call at 5:58 p.m. on August 4, 2013, on Kalmia Street, were diverted to where the victim, Orlandous Jackett, was bleeding from gunshot wounds and

going in and out of consciousness, and where a bright blue Camaro with five bullet holes was parked at an odd angle nearby.  (RT 928-37.)

Guillermo Trejo testified that about 5:30 p.m. on August 4, 2013, he heard gunshots and saw two cars, a brown or gold sedan and a blue Camaro, and said the shots came from one car to the other.  (RT 952-55.)  When interviewed by police that night he said he saw someone standing outside a gold Camry with his face covered firing at the blue Camaro, and the man in the Camaro firing back and hitting the back window of the Camry.  (RT 965-66.)  About 5:45 p.m. that evening two African-American males were seen running from the gold Camry, which had been shot up.  (RT 969-73, 976-81.)

Vladimir Nazarov, a San Diego Police Officer, testified that on August 4, 2013, he interviewed gunshot victim Orlandous Jackett, who said he was driving home and was stopped at a stop sign when the passenger of a car coming in the opposite direction got out and fired five or six shots at him.  (RT 989-94.)  A gang detective testified that Jackett is a documented member of the Neighborhood Crips, his distinctive blue car was readily identifiable to people in the area as a car driven by a Neighborhood Crip, and driving a bright blue car in rival gang territory is a sign of disrespect.  (RT 1000-11, 1216.)  Don Holmes was recalled and testified that on August 4, 2013, Petitioner's phone used cell towers in the general area of the shooting when it occurred.  (RT 1177-90.)

Three WIN 9 millimeter Luger and three .40 caliber bullet casings were found at the scene of the August 4, 2013 shooting, and three WIN 9 millimeter Luger casings were found inside the Camry.  (RT 1041-55, 1066-69.)  Petitioner's fingerprints were not found in the Camry.  (RT 1095-1104.)  Desmond Crisp was a major contributor to DNA found in the interior of the Camry, and DNA from Orlandous Jackett was found in the blood stain in the Camaro.   (RT 1111-16.)

Officer Cisneros was recalled to testify that Byreese Taylor, a Lincoln Park gang member, was shot at but not hit while walking home from work on August 27, 2013.  (RT 1154.)  He called Petitioner to tell him about it and a recording of the call was played for the jury in which Taylor said it is time for a retaliatory shooting, to which Petitioner replied:

"It's been that time," and "I've been tryin' to get my car so I could do my part." (RT 1154-65; CT 625.) The .40 caliber casings recovered at the two drive-by shootings were fired from the same gun, and the bullets collected from the Camry and Camaro were fired from the same nine millimeter gun. (RT 1360.) The People rested. (RT 1363.)

Dwayne Harvey testified that he grew up in Southeast San Diego, was aware of gang activity in the area, and allowed neighborhood children to play in the backyard of his mother-in-law's house at 5221 Logan Avenue. (RT 1477-81.) He did not believe his sons and Petitioner are gang members, but is aware they are documented as gang members by the police, and said he never saw his sons or Petitioner with a gun. (RT 1483-96.) Petitioner's mother testified that she owned a green Saturn and a green Lexus and allowed all her children to drive them. (RT 1524, 1527.) Petitioner has 46 Facebook friends who are gang members, and he posted a picture of himself at the graveside of one of four Lincoln Park members known to have been shot and killed in the last few years. (RT 1608-14.)

Reginald Washington testified that he is a former Skyline Eastside gang member who served a prison term for a gang shooting and currently works with Project Aware, which he created in prison, helping young men avoid gang involvement. (RT 1623-42.) He said it was not plausible for a gang member to hang on to a car used in a shooting. (RT 1651-52.) He opined that Petitioner's reference to "that" in his phone calls likely means obtaining a weapon for protection or to commit a crime. (RT 1649.) He said that only one of the ten criteria used by police to document gang members involves violence or criminal activity, and it is possible to be documented and not a gang member. (RT 1647-48, 1661-62.) The parties stipulated that Orlandous Jackett had gunshot residue on his person, and that ten San Diego Police officers would testify they conducted traffic stops of Petitioner in 2012-13, four times while he was driving a green Lexus and six times while he was in a green Saturn, and during several stops he admitted he was a member of the Lincoln Park gang. (RT 1697-1700.) The defense rested.

The prosecution provided rebuttal evidence that the house at 5221 Logan Avenue is owned by Kyle Winters' mother and is a hangout for Lincoln Park gang members, that

18cv1751-JAH (MSB)

Kyle Winters is the father of Deon Winters, and both are Lincoln Park gang members. (RT 754, 1539, 1704-05.) The prosecutor represented outside the presence of the jury that Kyle Winters' mother is called "Grammie" and her house is referred to as "Grammie's house." (RT 754, 1539.) Police responded to the house on March 26, 2009, based on a complaint that a woman's daughter was being held there against her will, entered the house and found the girl, as well as cocaine, rifles and gang paraphernalia, and arrested Alonzo Harvey and Deon Winters. (RT 1706-10.)

After deliberating a day and a half, the jury found Petitioner guilty on count one, conspiracy to commit first degree murder and assault with a deadly weapon based on the events of April 27, 2013. (CT 479, 838-44.) They returned a true finding on the allegation that he committed count one for the benefit of, at the direction or, or in association with a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang members. (CT 843-44.) The jury found him not guilty of criminal street gang conspiracy and attempted murder for the July 28, 2013 shooting as charged in counts two and three, and not guilty of criminal street gang conspiracy and attempted murder for the August 4, 2013 shooting as charged in counts four and five. (CT 480-88, 845-50.) He was sentenced to twenty-five years to life in state prison. (CT 851.)

### III. **DISCUSSION**

Petitioner claims his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated because there is insufficient evidence from which a jury could reasonably infer he entered into an agreement with anyone to kill or assault rival gang members (claim one), and because the elements of conspiracy were established only by his own statements in violation of California's corpus delicti rule (claim two). (ECF No. 3 at 7-13.) In claim one, he alleges a violation of his federal constitutional right to the effective assistance of counsel due to his trial counsel's failure to seek acquittal on the basis of insufficient evidence, and failure to interview and call as defense witnesses Stanley King, Desmond Crisp, Jawaun Jones, Glenn Gray, Alonzo Harvey, Deon Winters, Darryl Charles and Aaron Harvey. (Id. at 9.)

Respondent answers that the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of, clearly established federal law which requires that every element of an offense to be proven beyond a reasonable doubt, because sufficient evidence was presented for the jury to draw a reasonable inference Petitioner entered an agreement with one or more of his fellow gang members to conduct a drive-by shooting at the Crips' party. (ECF No. 8-1 at 12-17.) Respondent contends claim two does not present a claim cognizable on federal habeas because it relies only on state law, and the ineffective assistance of counsel claims are unexhausted and cursory. (Id. at 17-20.)

Petitioner replies that because the evidence that he entered into an agreement to kill or assault someone is nonexistent, or so weakly circumstantial as to amount to speculation, the state court adjudication of claims one and two involves an unreasonable application of clearly established federal law. (ECF No. 11 at 1-10.) He requests that if the Court finds his ineffective assistance of counsel claims are not exhausted, this action be stayed and his federal petition held in abeyance while he exhausts state court remedies. (Id. at 10 n.3.)

### A. Standard of Review

In order to obtain federal habeas relief with respect to a claim adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Satisfying § 2254(d) is a threshold requirement, and even if it is satisfied, or does not apply, a petitioner must still show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially

indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." <u>White v. Woodall</u>, 572 U.S. 415, 427 (2014) (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011)). In order to satisfy § 2254(d)(2), a petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

### B.    Claim One

Petitioner alleges in claim one that his Fourteenth Amendment right to due process was violated because there is insufficient evidence to support his conviction. (ECF No. 3 at 7-9.) He argues there was no evidence he entered into an agreement with anyone to murder or assault anyone, and in fact the opposite occurred, as everyone he allegedly attempted to enlist to join him in a drive-by shooting at the Crips' party refused to become involved, and although circumstantial evidence can establish the agreement element of conspiracy, there comes a point where, like here, the evidence is so slight it amounts to mere speculation. (<u>Id.</u> at 9-10; ECF No. 11 at 1-10.)

Respondent answers that the state court denial, on the basis that sufficient evidence was presented to allow the jury to draw a reasonable inference Petitioner entered into an agreement with one of his fellow gang members to do a drive-by shooting at the Crips' party, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (ECF No. 37-1 at 11-12.)

Petitioner presented this claim to the state supreme court in his petition for review. (Lodgment No. 6.) That petition was denied with an order which stated: "The petition for

review is denied." (Lodgment No. 7.) The same claim was presented to the state appellate court on direct appeal and denied in a written opinion. (Lodgment Nos. 3, 5.)

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The Court will look through the silent denial by the state supreme court to the last reasoned state court opinion addressing the claim, the appellate court opinion, which states:

> Anderson argues there is no evidence to show he entered into an agreement with another person to commit first degree murder. He states a reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work, but must be drawn from the evidence. Anderson contends the People's argument is based on pure speculation.

> The People assert circumstantial evidence clearly shows Anderson agreed with fellow gang members to shoot Crip gang members. The People argue the fact Anderson was looking for two guns shows he had agreed with at least one other person to attack the Crip gang members.

> *Applicable Legal Principles and Standard of Review*

> "Pursuant to section 182, subdivision (a)(1), the crime of conspiracy, a crime distinct from its target offense, occurs when two or more persons have the specific intent to agree to commit '*any crime*' (italics added), as well as the specific intent to commit the elements of the target crime and one or more of the parties commits an overt act in furtherance of the agreement. The act of one conspirator is the act of all. Each is responsible for everything done by his coconspirators, including those things that follow as the probable and natural consequence of the execution of the conspiracy." (*People v. Zacarias* (2007) 157 Cal.App.4th 652, 657 (*Zacarias*).)

> "Conspiracy is an inchoate crime. It does not require the commission of the target offense. Because it is an inchoate crime, conspiracy fixes the point of legal intervention at the time of the agreement to commit a crime." (*Zacarias, supra*, 157 Cal.App.4th at p. 657.)

> Murder is the unlawful killing of a human being with malice aforethought. (§ 187.) "A killing with express malice formed willfully,

deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) "Generally, the intent to unlawfully kill constitutes malice." (*People v. Breverman* (1998) 19 Cal.4th 142, 153.) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) "(A)ny murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." (*People v. Swain* (1996) 12 Cal.4th 593, 601; § 189.)

Assault is "'any wrongful act committed by means of physical force against the person of another.'" (*People v. Golde* (2008) 163 Cal.App.4th 101, 108.)

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (Citation.) The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 (*Kraft*).) The conclusions of the trier of fact can be supported by circumstantial evidence as well as by direct evidence. (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 996.)

*Substantial Evidence Supports Anderson's Conviction for Conspiracy to Commit Murder and Assault with a Deadly Weapon*

Anderson acknowledges the record shows he was upset at having seen rival gang members at the Grape Street party. He also concedes he tried to locate two guns, which constitute overt acts. Anderson asserts there is no evidence that would allow the jury to reasonably infer he ever entered into an agreement with another person to kill rival gang members. He argues he may have been trying to locate two guns before approaching any fellow gang members to kill rival gang members. We are not persuaded by this argument.

Under the substantial evidence standard of review, we examine the entire record in the light most favorable to the judgment. (*Kraft, supra*, 23 Cal.4th at p. 1053.) We therefore must reject Anderson's hypothetical

18cv1751-JAH (MSB)

scenario. The record supports the reasonable inference Anderson entered into an agreement with other gang members to shoot rival gang members before attempting to locate two guns.

Police officers listening to Anderson's telephone calls testified there were voices in the background on Anderson's side discussing the large number of Crips at the party. This indicates the persons who were with Anderson also reacted to the presence of the Crips. In his first telephone call after seeing the Crips, Anderson reminded Gray how he had felt when he saw the Crips at the Grape Street house on another occasion. Approximately 10 minutes later, Gray asked Anderson "what's brackin?" [Footnote: Bloods substitute the letter "b" for the letter "c." Gray was asking Anderson "What's cracking""] Anderson replied, "Tryna go do that," and offered to send "my folks" to "come get you." These remarks permits the reasonable inference Anderson had formed the intent to shoot Crips and his "folks" were willing to assist him by picking up Gray to help in the attack.

Anderson telephoned Lincoln Park gang members in an effort to locate guns. Anderson told a gang member he might not want the gun back because Anderson intended to use it for some drama. A homicide detective testified there was a history of retaliatory incidents between the Bloods and the Crips and a shooting could result from a happenstance meeting for no reason.

Anderson told a gang member he needed a gun because "blood a nigga, nigga is trying to go do something real quick." Anderson told another gang member some people were not answering their phones and he was trying to "bust a move somewhere, somewhere else right now." He told Gray he was "trying to bust a move away from here." Anderson continued to look for guns. After he located one gun, he continued to look for a second gun. The trier of fact could reasonably infer there was a second person involved in Anderson's plan to attack the Crips. The record shows that Anderson stopped looking for a second gun after a gang member told him where his gun was. Anderson then contacted unidentified persons several times to ascertain the location and strength of the police presence. Anderson told a gang member "as soon as we get the first chance to bop, we outa here." In view of the evidence showing he had obtained two guns, Anderson's use of the term "we" indicates he did not intend to act alone.

The substantial evidence standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Story* (2009) 45 Cal.4th 1282, 1296.) We do not reweigh the evidence but review whether the reasonable inferences that could be derived from such

evidence support the conclusions of the trier of fact. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)   Here, the record shows that other people with Anderson saw the Crips at the Grape Street house, Anderson made concerted efforts to locate two guns, he used the plural pronoun "we" in describing the plan to leave at the first opportunity, Anderson was an active member in the Lincoln Park gang and had ongoing contact with other gang members.   In addition, the record shows the Bloods and Crips in southeast San Diego had a history, and current practice, of gang retaliation and drive-by shootings.   We conclude there is substantial evidence from which the jury could reasonably conclude that Anderson entered into an agreement with other persons to shoot the Crips who were at the birthday party at the Grape Street house.

(Lodgment No. 5, <u>People v. Anderson</u>, No. D069071, slip op. at 7-12.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). That clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979).   The standards of 28 U.S.C. § 2254(d) require an additional layer of deference in applying the <u>Jackson</u> standard, and this Court "must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' <u>Jackson</u> and <u>Winship</u> to the facts of this case." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(1)).   Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," not as a means of error correction. <u>Richter</u>, 562 U.S. at 103 (quoting <u>Jackson</u>, 443 U.S. at 332 n.5).

"A conviction for conspiracy [under California law] requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy." <u>People v. Vu</u>, 143 Cal.App.4th 1009, 1024 (2006).   The trial evidence showed that: (1) Petitioner and his brother Desmond Crisp, both

Lincoln Park gang members, drove past a party attended by numerous Crips in Lincoln Park territory, which upset Petitioner so much he wanted to cry; (2) he then called fellow gang member Gray, told him there were numerous Crips in their territory which made him want to cry the same way a previous similar event at the same spot had made Gray want to cry, and asked if he wanted to come out; (3) Petitioner then called fellow gang members Charles, Winters, Jones and Harvey who helped him acquire a gun and assisted him in attempting to locate another, and Petitioner told Harvey and Winters he was trying to do something; (4) voices of people with Petitioner are heard in the background during those calls, including correcting him regarding the number of Crips at the party; (5) it is uncommon for drive-by shootings by gang members to be conducted alone, and they usually involve a driver and a shooter in one car and a driver of a second escape car; (6) the Crips and Lincoln Park gangs have a history of opportunistic retaliatory shootings; (7) Petitioner agreed with a fellow gang member that it is past time for a retaliatory gang shooting; (8) he enlisted the help of a female friend to drive around the neighborhood that night to determine if the increased police presence meant he could not leave the neighborhood without being pulled over by the police; (9) during that evening he said "we can't even fucking get the hell away from here," "we can't hop, skip and jump and not get in nothing," and "as soon as we get the first chance to bop, we outta here,"; and (10) the next morning he said "we was gonna leave and go somewhere else," but were prevented from doing so by the police presence in his neighborhood that night. The jury could draw a reasonable inference from the evidence that Petitioner expressly or tacitly reached an agreement with one or more of his fellow gang members to conduct a drive-by shooting at the Crips party with the specific intent to assault the partygoers with a firearm and attempt to murder them, and the only reason they did not do so was because Petitioner confirmed with the help of a friend they could not leave the neighborhood without being stopped by the police.

Petitioner argues that the agreement element of conspiracy was not proven beyond a reasonable doubt because there was no evidence anyone agreed to come out that night

and go with him on a shooting. (ECF No. 3 at 8-9.) "To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'" Vu, 143 Cal.App.4th at 1025 (quoting People v. Brown, 272 Cal.App.2d 623, 628 (1969)). "Because there rarely is direct evidence of a defendant's intent, '(s)uch intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.'" Id. (quoting People v. Chinchilla, 52 Cal.App.4th 683, 690 (1997)).

Petitioner argues the evidence shows he had difficulty enlisting anyone to do anything that evening, and the only person he mentioned Crips to on any of the phone calls, Gray, declined the invitation to have "some of my folks to come get you." (CT 543.) He points out he asked Charles at 10:40 p.m. if he was going to come hang out, and Charles said "fuck that." (CT 548.) But Charles told Petitioner he was in bed, and it is unclear whether Charles knew what was happening at that point, as it is only after Charles declined to go out that Petitioner asked to borrow a gun. (Id.) Petitioner made several unanswered calls from 10:44 to 11:38 p.m., looking for a second gun and complaining no one was answering his calls, and argues he never explicitly asked anyone to come with him anywhere. He points out that Detective Morales and Sergeant Cruz both testified that during the intercepted calls they never heard him say what he planned to do with the gun, or heard him enter an agreement to do something with the gun. (ECF No. 3 at 11.) Thus, he argues, even if fellow gang members were assisting him in obtaining guns, the circumstantial evidence that he entered into an agreement with one of them to join him in a drive-by shooting at the party relies on pure speculation that an agreement was formed with one of the persons heard in the background while he was making the calls.

The Court must accept the state court's finding that circumstantial evidence by itself is sufficient under state law to establish Petitioner entered into an agreement with one or more of his fellow gang members to go on a drive-by shooting at the Crips' party. See Jackson, 443 U.S. at 324 n.16 (holding that federal habeas courts must analyze Jackson

claims "with explicit reference to the substantive elements of the criminal offense as defined by state law."); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (Federal habeas courts "are bound by a state court's construction of its own penal statutes."); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") The Court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict. Jackson, 443 U.S. at 319.

The jury could have drawn a reasonable inference that the people who helped Petitioner locate firearms that evening, and the people who were with him while he was locating firearms, knew he was going to use them in a drive-by shooting at the Crips' party. In addition to Petitioner's numerous references to "we" that night, Sergeant Cruz testified that it is clear that the people whose voices are heard in the background while Petitioner was making those calls are with Petitioner. (RT 270-71.) When Petitioner initially called Gray and told him about the Crips gathered at the party, voices in the background with Petitioner are heard correcting him, saying "way more than that" after Petitioner describes the number of Crips, after which Petitioner reemphasizes that there are a large number of Crips at the party. (RT 269-70, 383-84.) The voices of people with Petitioner can also be heard in his call to Winters asking where the other gun could be found. (RT 354.) Thus, Petitioner was with other people when describing how many Crips were at the party and how upset he was about seeing a large gathering of Crips on Lincoln Park territory, as well as when he acquired one gun and was looking for a second one. He said "we" when asking to borrow a gun, when referring to when he was going to leave after acquiring the firearms, and the next morning when stating he did not leave the neighborhood due to the police presence. In light of that evidence, in particular his repeated use of "we," as well as evidence that Petitioner believed the time was right for a retaliatory shooting, that it is unusual for drive-by shootings by gang members to be conducted alone, that Petitioner was looking for another gun after having acquired one, that the Crips and Lincoln Park gangs

have a history of opportunistic retaliatory shootings, and Petitioner's enlistment of a friend to test to see if the police presence would prevent him from leaving the neighborhood without being pulled over, a reasonable inference could be drawn that Petitioner explicitly or tacitly entered into an agreement with one or more of the people he was with, or one or more of the people who were assisting him to locate firearms, to attempt to assault and murder people by conducting a drive-by shooting at the Crips party. See Vu, 143 Cal.App.4th at 1025 ("[A] criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design."); Jackson, 443 U.S. at 324 n.16 (holding that federal habeas courts must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law.").

Even if Petitioner is correct that a reasonable inference could be drawn from the evidence that he failed to find someone to go with him on a drive-by shooting, that alone is not sufficient to demonstrate it was unreasonable for the state court to conclude the jury could have drawn an inference that he entered such an agreement. See Cavazos v. Smith, 565 U.S. 1, 7 (2011) (holding that Jackson "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'") (quoting Jackson, 443 U.S. at 326); Coleman v. Johnson, 566 U.S. 650, 656 (2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality.").

Accordingly, in light of the additional layer of deference this Court must give in applying the Jackson standard, as well as the Supreme Court's admonition that federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," Richter, 562 U.S. at 103(quoting Jackson, 443 U.S. at 332 n.5), it is clear that the state court state court adjudication does not reflect "an 'unreasonable application of' Jackson and Winship to the facts of this case." Juan H, 408 F.3d at 1274. In addition,

there is no basis to find that the factual findings upon which the state court's adjudication of this claim rest are objectively unreasonable. <u>Miller-El</u>, 537 U.S. at 340. The Court therefore recommends that habeas relief be denied as to claim one.

## C.    Claim Two

Petitioner alleges in claim two that the prosecution did not prove the elements of conspiracy independent of his own statements in violation of the California's corpus delicti rule. (ECF No. 3 at 10-13.) Respondent answers that this claim is not cognizable on federal habeas as it presents only a question of state law. (ECF No. 8-1 at 17-20.)

Petitioner presented this claim to the state supreme court in a petition for review, which was summarily denied without a statement of reasoning, and to the appellate court, which denied it in a written opinion. (Lodgment Nos. 3, 5-7.) The last reasoned state court opinion addressing the claim is the appellate court opinion, which states:

> Anderson contends the People did not present any evidence of conspiracy other than his own statements. He argues this violates the corpus delicti rule, which requires the prosecutor to make a prima facie showing he entered into an agreement with another person to commit first degree murder by evidence other than defendant's own statements, and requires reversal.

> The People contend the purpose of the corpus delicti rule is to assure that a defendant has not confessed to a crime that was not committed. The People argue the corpus delicti rule has little application to this case because Anderson's statements were not a confession but instead were part of the crime of conspiracy. Conspiracy requires both an agreement and overt acts in furtherance of the agreement. The People assert the record contains enough evidence, independent of Anderson's statements, to show the conspiracy.

> *Additional Factual Background*

> At the People's request, without objection, the trial court instructed the jury:

> > "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime was committed.

"That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.["]

"The requirement of other evidence cannot be proved by statements made before or after a crime, but can be proved by statements made during the crime.["]

"This requirement of other evidence does not apply to proving the identity of the person who committed the crime. If other evidence shows that the charged crime was committed, the identity of the person who committed it may be proved by the defendant's statements alone.["]

"You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." (CALCRIM No. 359.)

### Applicable Law and Standard of Review

"To convict an accused of a criminal offense, the prosecution must prove that (1) a crime actually occurred, and (2) the accused was the perpetrator. Though no statute or constitutional principle requires it, California, like most American jurisdictions, has historically adhered to the rule that the first of these components-the corpus delicti or body of the crime-cannot be proved by exclusive reliance on the defendant's extrajudicial statements." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1164–1165 (*Alvarez*).) "On appeal, a defendant may make a direct claim that there was insufficient evidence, aside from his statements, of the corpus delicti." (*Id.* at p. 1165.)

"In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying exclusively upon the extrajudicial statements, confessions, or admissions of the defendant. (Citations.) . . . (¶) This rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Alvarez, supra*, 27 Cal.4th at pp. 1168–1169.) "(A)s historically applied, the rule requires corroboration of the defendant's extrajudicial utterances insofar as they indicate a crime was committed, and forces the People to supply, as part of their burden of proof in every criminal prosecution, some evidence of the corpus delicti aside from, or in addition to, such statements. (*Id.* at p. 1178.)

18cv1751-JAH (MSB)

"Expert opinion testimony may support the corpus delicti when two conditions are met. First, the opinion must be '(r)elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).) Second, the opinion must be based on 'matter . . . perceived by or personally known to the witness . . . that reasonably may be relied upon by an expert in forming an opinion upon the subject to which (the expert's) testimony relates. . . .' (Evid. Code, § 801, subd. (b).) Although the expert cannot directly opine that the defendant is 'guilty' to support the corpus delicti (citation), the expert may testify as to various '"ultimate issues"' including facts necessary to establish the corpus delicti of a charge." (*People v. Powers–Monachello* (2010) 189 Cal.App.4th 400, 412.)

"The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. (Citations.) There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. (Citation.) In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Alvarez, supra*, 27 Cal.4th at p. 1171.)

Our review is de novo. (See *Alvarez, supra*, 27 Cal.4th at pp. 1181-1182.)

### There is Independent Evidence to Establish the Corpus Delicti of Conspiracy

The People rely on cases holding that extrajudicial statements that are themselves a part of the conduct of the crime, are not subject to the corpus delicti rule. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394, abrogated on another point by *People v. Diaz* (2015) 60 Cal.4th 1176, 1185–1187.) While statements made during a crime may be considered, the corpus deliciti rule nevertheless requires corroboration of the defendant's extrajudicial utterances insofar as those statements indicate a crime was committed. (*Alvarez, supra*, 27 Cal.4th at p. 1178.) Therefore, the People must show some evidence of the corpus delicti aside from, or in addition to, such statements. (*Ibid*.)

There is sufficient corroboration in the record to ensure that Anderson was not falsely convicted, by his words alone, of a crime that never happened.

(*Alvarez, supra*, 27 Cal.4th at pp. 1168–1169.) The evidence shows there were a large number of Crip gang members gathered at a party in southeast San Diego. Cell phone tower data indicates that Anderson passed through that area of town. His companions commented on the large number of gang members at the party, indicating they and Anderson noted the Crips' presence. Other gang members described the locations where Anderson might find guns. Cell phone data showed that Anderson moved from one location to another when informed where the guns were hidden. A gang member reported to Anderson that one of the guns he was looking for was in Mira Mesa. Another person used Anderson's cell phone to describe his inability to leave their location because of the heavy police presence. In addition, expert witnesses testified about gang practices, including the many retaliatory drive-by shootings that recently had occurred in the area between rival gangs. Therefore, as a matter of law, the record contains the requisite prima facie showing, independent of defendant's extrajudicial statements, to satisfy the corpus delicti rule. (*Alvarez*, at p. 1182.)

(Lodgment No. 5, <u>People v. Anderson</u>, No. D069071, slip op. at 12-16.)

Although Respondent contends this claim does not present a federal question because it alleges only an error of state law, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness."). Respondent recognizes that a federal due process violation can arise from a state law ruling that is arbitrary or capricious. (ECF No. 8-1 at 20 (citing <u>Richmond v. Lewis</u>, 506 U.S. 40, 50 (1992) (holding that a state court's application of state law does not rise to the level of a federal due process violation unless it was so arbitrary or capricious as to constitute an independent due process violation)).

The state court correctly observed that evidence other than Petitioner's statements was presented to establish the crime of conspiracy, including: (1) cell phone tracking data, which indicated Petitioner drove past a house where a resident testified a large gathering of Crips were at a party and a neighbor testified the house often hosted parties with

attendees identifiable as Crips; (2) gang expert testimony which indicated the Crips' party was in Lincoln Park territory, that Petitioner is an active Lincoln Park member, that Lincoln Park and Crips conduct opportunistic retaliatory shootings at each other when they see each other in each other's territory, that at least four Lincoln Park members had been shot and killed in the last few years, and that a Lincoln Park member had recently been shot at and told Petitioner the time was right to retaliate; and (3) statements by Petitioner's friends and fellow gang members, which indicated they assisted him in locating firearms after a large gathering of Crips were seen in their territory, and in determining whether it was possible to leave the neighborhood that night without being stopped by the police. As discussed above in claim one, the jury was able to draw a reasonable inference Petitioner entered into an agreement with fellow gang members to carry out a drive-by shooting of the Crips party, which was thwarted only by police intervention. The state court determination that he was not convicted solely on the basis of his own statements of a crime that never happened is well supported by the record and is not arbitrary and capricious. See Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) (holding that a federal habeas court must defer to the state court's construction of its own law unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation.").

The Court finds that the state appellate court's adjudication of claim two is neither contrary to, nor involves an unreasonable application of, clearly established federal law, nor based on an objectively unreasonable determination of the facts. Accordingly, the Court recommends habeas relief be denied as to claim two.

### D. Ineffective Assistance of Counsel Claims

In the body of claim one, Petitioner argues that because there is insufficient evidence to support his conspiracy conviction, his trial counsel was ineffective for failing to move for an acquittal on that basis, and was deficient in failing to interview and call as witnesses for the defense Desmond Crisp, Jawaun Jones, Glenn Gray, Alonzo Harvey, Deon Winters, Darryl Charles, Stanley King and Aaron Harvey. (ECF No. 3 at 8-9.) Petitioner presented these claims to the superior court in a habeas petition along with allegations that his trial

counsel failed to object to the conspiracy jury instructions as misleading and confusing, file a motion for a new trial, seek recusal of the trial judge, and object to the introduction of irrelevant telephone calls. (ECF No. 9-25.) There is no indication he ever presented the claims to any other state court.

Respondent argues the claims are cursory and Petitioner's failure to present them to the state supreme court prevents this Court from granting relief. (ECF No. 8 at 2-3; ECF No. 8-1 at 17.) Petitioner replies that to the extent he has not exhausted state court remedies, he requests a stay and abeyance to do so. (ECF No. 11 at 10 n.3.)

Although the claims have not been presented to the state supreme court, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); see also Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005) (holding "that a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim."). Because the ineffective assistance of counsel claims are plainly meritless, the Court recommends denying habeas relief irrespective of the failure to present them to the state supreme court and without a stay and abeyance. Id.; see also Dixon v. Baker, 847 F.3d 714, 720-22 (9th Cir. 2017) (holding that stay and abeyance is unavailable where the unexhausted claims are plainly meritless).

Petitioner alleges his trial counsel was deficient in failing to move for an acquittal based on insufficient evidence of conspiracy, and relies on the same arguments in claim one in which he contends there is insufficient evidence of an agreement to commit assault or murder. (ECF No. 3 at 8-9.) Immediately after the People rested their case in chief, defense counsel made a motion for acquittal as to all counts other than count one, which was denied. (CT 830; RT 1444-57.) Because the motion was denied as to the counts on which Petitioner was ultimately acquitted, it appears unlikely the trial judge would have granted the motion as to the count on which Petitioner was ultimately convicted. In any case, as discussed above, there is sufficient evidence to support the conspiracy conviction.

Accordingly, a motion for acquittal would have been futile, and "the failure to take a futile action can never be deficient performance." Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).

Petitioner alleges his trial counsel failed to subpoena, interview and call as defense witnesses Desmond Crisp and Stanley King, who he refers to as his indicted co-conspirators, as well as Jawaun Jones, Glenn Gray, Alonzo Harvey, Aaron Harvey, Darryl Charles and Deon Winters, who he refers to as his unindicted co-conspirators. (ECF No. 3 at 5.) In support of his state habeas petition, he presented affidavits from Gray, King, Jones and Crisp, stating that they were willing to testify at Petitioner's trial but were not contacted by the defense. (ECF No. 9-25 at 22-31.) Gray states that he would have testified that during their telephone calls on the night of April 27, 2013, Petitioner never asked him to commit a crime, Gray never encouraged Petitioner to commit a crime, and they did not conspire to commit murder or assault anyone. (Id. at 22.) King states that while he was hanging out in front of Grammies with Petitioner that night Petitioner never mentioned anything about seeing rival gang members, never mentioned Crips or how deep they were, never talked about retaliation, assault or murder, and King did not conspire with him to commit assault or murder. (Id. at 24.) Jones states that during their telephone call that night Petitioner did not express anger or hostility, never mentioned trying to commit murder, assault or any other crime, and Jones did not conspire with him to commit any crime. (Id. at 27.) Crisp states that when Petitioner took him to his girlfriend's house that night Petitioner was not mad or angry, they never discussed committing any crime, and the two of them did not conspire to commit a crime. (Id. at 30.)

The parties stipulated that each of the eight individuals Petitioner claims his trial counsel should have called to testify were members of the Lincoln Park street gang at the time of the events, and that the Lincoln Park street gang meets California's legal criteria of a criminal street gang. (RT 1360-61.) In addition, other than Alonzo Harvey, they were all initially charged in this case along with Petitioner, and Crisp, Charles, Gray and King entered guilty pleas prior to Petitioner's trial. (CT 1-16; 729.)

In order to establish constitutionally ineffective assistance of counsel, Petitioner must show that his counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). He must also show counsel's deficient performance prejudiced his defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. For prejudice, there need only be a reasonable probability that the result of the proceeding would have been different absent the error. Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

As to the performance prong, Petitioner must overcome a strong presumption that it was a strategic choice by defense counsel to forgo calling as witnesses Petitioner's fellow gang members and co-conspirators. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). In determining whether a strategic choice is reasonable, the Court must consider whether the decision was based on a reasonable investigation. Id. at 690-91 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691; Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999) ("A lawyer who fails to adequately investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.").

The affidavits of Gray, King, Jones and Crisp are clearly insufficient to undermine confidence in the verdict. Their personal opinions as to whether their recorded telephone conversations established the elements of conspiracy are legally incompetent and self-

serving, as all four were charged in this case, and Gray, King and Crisp entered guilty pleas. Petitioner has not indicated what testimony Alonzo Harvey, Aaron Harvey, Darryl Charles and Deon Winters would provide, but assuming it is in the same vein as Gray, King, Jones and Crisp, they all would have been subject to cross-examination regarding their gang activities. Petitioner's brother Crisp represented a particular danger to the defense. He was charged along with Petitioner in count one, his DNA was found in the stolen Camry used in both drive-by shootings, he pled guilty to criminal gang conspiracy involving a May 28, 2013 shooting at an occupied structure which was not mentioned at trial, and evidence was presented that his brother Christopher, who is also Petitioner's brother, may have purchased the stolen Camry from the man who stole it. King, Charles and Gray also entered guilty pleas prior to Petitioner's trial, and were apparently serving prison terms for those offenses at the time of trial. (CT 729.) The decision by defense counsel not to call witnesses who had little or no helpful testimony and were capable of providing potentially damaging evidence, in particular regarding the counts on which they had been charged and on which Petitioner was ultimately acquitted, was clearly within the "wide latitude counsel must have in making tactical decisions." Strickland, 466 U.S. at 689.

Furthermore, even assuming that decision was based on an incomplete investigation because the witnesses were not interviewed by the defense prior to trial, and assuming these witnesses would have agreed to testify, Petitioner has not established he was prejudiced by the failure to call them at his trial. Their proffered testimony primarily concerns the context of Petitioner's intercepted telephone calls, recordings of which were played in court for the jury. Their testimony that Petitioner was not angry during those calls or while he was hanging out that night, and did not explicitly mention murder, assault with a firearm, Crips or retaliation, would not have materially assisted the defense because the prosecution did not rely on an explicit agreement. Rather, the prosecution presented testimony by Sergeant Cruz that gang members use coded words and phrases to communicate on gang matters, and that there is a history of retaliatory gang shootings between the Crips and Bloods. In light of that, and particularly in light of the obvious bias in Petitioner's favor of his brother

and fellow gang members, several of whom were initially charged on the same counts as Petitioner, it is not reasonably probable that the result would have been different had they testified they did not reach an agreement with Petitioner that night to murder the Crips who were attending a party in their territory or assault them with a firearm. Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" as a result of his trial counsel's failure to call those witnesses to testify. Strickland, 466 U.S. at 687. Accordingly, the Court recommends denying habeas relief irrespective of Petitioner's failure to present these claims to the state supreme court because they do not present colorable claims for relief.[2] 28 U.S.C. § 2254(b)(2); Cassett, 406 F.3d at 623-24.

Petitioner raised four other claims of ineffective assistance of counsel in his state habeas petition, and it is unclear whether he includes them in his request for stay and abeyance and wishes to present them here after exhaustion. However, because they too are plainly meritless, the Court recommends they be denied for the same reasons as the other ineffective assistance claims irrespective of exhaustion and without a stay and abeyance.

Petitioner alleges his trial counsel failed to object to the jury instructions regarding conspiracy on the basis they were confusing, misleading or inadequate. (ECF No. 3 at 5.)

---

[2] To the extent these claims "present a colorable federal claim" so as to preclude application of 28 U.S.C.§ 2254(b)(2), the Court would alternately find it would be futile for Petitioner to now present his ineffective assistance of counsel claims to the state supreme court, and therefore the claim is considered to be exhausted. See Cassett, 406 F.3d at 621 n.5 (quoting Coleman v. Thompson, 501 U.S. 722, 732 (1991)) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."); Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that Phillip's claims were nonetheless exhausted because a return to state court would be futile."). It appears it would be futile for Petitioner to present his claim for the first time to the state supreme court nearly two years after that court denied his petition for review, as it would be met with a state timeliness bar. See Walker v. Martin, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied).

However, neither here (id.), nor in the state court (ECF No. 9-25 at 7-8), does he identify any defect in the instructions or any basis for an objection.  As such, the claim fails as conclusory.  See Blackledge v. Allison, 431 U.S. 63, 74 (1977) (denying habeas relief on the basis that "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (holding that conclusory allegations are insufficient to support a claim of ineffective assistance of counsel).

Petitioner alleges his trial counsel failed to file a motion for a new trial.  (ECF No. 3 at 5.)  There are no allegations supporting this claim in the First Amended Petition (id.), and in the state habeas petition he based this claim on the same argument he set forth as to why counsel was deficient in failing to seek an acquittal, that there was insufficient evidence of conspiracy.  (ECF No. 9-25 at 13.)  This claim fails for the same reason his claim that trial counsel was ineffective for failing to file a motion for acquittal fails.

Petitioner alleges his trial counsel should have sought to recuse the trial judge.  (ECF No. 3 at 5.)  In his state habeas petition he contended the trial judge should not have presided over his two preliminary hearings and his trial because a judge should not hear the evidence more than once, and that he felt the trial judge "already had his mind made up and he was biased.  As well as he was favorable to the prosecution and not fair to trial counsel."  (ECF No. 9-25 at 14.)  This claim fails as conclusory.  See Withrow v. Larkin, 421 U.S. 35, 47 (1975) (holding that to succeed on a judicial bias claim, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators."); Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) ("In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity.").

Finally, Petitioner alleges counsel was ineffective for failing to object to the introduction of the phone calls which were not charged as overt acts.  (ECF No. 3 at 5.) The only one he identified in his state habeas petition is the August 27, 2013 call between himself and Taylor, where Taylor said he had been shot at but not hit and the time was right

for a retaliatory shooting, to which Petitioner replied that the time was past due. (ECF No. 9-25 at 15.) He argues that it should have been objected to on the basis it is irrelevant and prejudicial because Taylor was not shot or hurt. (Id.) The call was clearly relevant and admissible, and any objection would have been futile. Rupe, 93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance.").

The Court recommends denying habeas relief as to Petitioner's ineffective assistance of counsel claims irrespective of his failure to present them to the state supreme court and without a stay and abeyance because they fail to present colorable claims for relief. See 28 U.S.C. § 2254(b)(2); Cassett, 406 F.3d at 623-24; Dixon, 847 F.3d at 720-22.

## IV.     CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the First Amended Petition for a Writ of Habeas Corpus.

**IT IS ORDERED** that no later than **April 22, 2019**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 10, 2019.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  March 19, 2019

Honorable Michael S. Berg
United States Magistrate Judge

18cv1751-JAH (MSB)